Nicholson, C. J.,
delivered the opinion of the Court.
On the 12th of May, 1866, the Legislature passed an .let authorizing the Directors of the Penitentiary to lease out the lábor of the convicts for the Term *102 of four years. The act required the Directors to advertise for proposals, setting forth therein in full the-conditions upon which the convict labor was to be-hired out. It provided that the proposals should be opened by the Directors in the presence of the Governor, and that the contract should be awarded to the highest and best bidder, all circumstances being fully considered; whereupon they were directed to close the contract, which should embrace substantially the-conditions and terms specified in the third section of the act. Under the advertisement so made the Directors accepted the bid of those under whom Ward & Briggs claim, and entered into a written contract with them, which contained the terms and conditions, specified in the act, and others not contained in srid third section, purporting to bind the State; among-which were these: the convicts are “to be kept under-strict discipline;” “the Directors or Warden are to-furnish a guard for each work-shop, day and night, and see that they faithfully perform their duty, and select such guards as are acceptable to the lessees;”' “the lessees, with the consent of the Directors, may-impose tasks -upon the convicts, and pay the Directors,, for the benefit of the convicts, such price as may be-agreed upon for overwork, if any.”
The lessees took possession, under the contract, on the 16th of August, 1866, and continued to use the-labor of the convicts until the first of July, 1869., On the 22d of June, 1867, there was a fire in one-of the workshops which destroyed much of the machinery, stock, and material of the lessees, for which *103 loss they received from two insurance offices, in which they had insured the property, $16,000, the amount of the policies, the loss having been, according to their sworn statement, $25,047.90. Up to the occurring of the fire the lessees had paid for the hire of the convicts according to the contract. After that time they.ceased to make payments, and commenced setting up a claim against the State for damages occasioned by the fire, and by the want of discipline of the convicts, under those provisions of the contract of lease which had been inserted by the Directors without being specified in the third section of the act authorizing the lease. The Legislature, not recognizing the validity of these claims for damages, ordered suit to be brought against the lessees for the arrears due for hire of convicts, which was done. Whereupon, on the 8th of January, 1869, the lessees made a written proposition to the Legislature for a surrender of their lease. On the 19th of February, 1869, the Legislature passed an act reciting the proposition of the lessees to surrender their lease, and accepting the same upon the terms proposed. By this act the machinery, tools, fixtures, materials, unfinished work, etc., were to be valued by appraisers appointed by the parties, the appraised value to be paid by the State. Appraisers were appointed, and they valued the tools, machinery, fixtures, etc., at $192,230.
On the 15th of February, 1869, the Legislature passed a resolution authorizing the suit commenced by the State against the lessees to be suspended upon the lessees agreeing in writing that “an arbitration be established by the appointment of an arbiter by the *104 Governor, one arbiter by the lessees, both of whom shall be -learned in the law, and the two so appointed shall select an umpire to settle any question of disagreement, and the board thus formed shall examine and determine all questions between the parties, and their decision shall be accepted as a final settlement of the matters in dispute between the State and the lessees of the Penitentiary.”
This proposition for arbitration was accepted by the lessees, and thereupon the Governor selected David Campbell, and the lessees E. H. East, as, arbiters.
The arbitrators proceeded to hear evidence and argument by counsel as to the matters involved in the arbitration, when they disagreed as to the following points:
1. Whether the law authorizing the lease conferred upon the Directors the power to introduce into the eon tract those stipulations, not specified in the act, which bound the State “to keep the convicts under strict discipline, and to furnish a guard for each workshop, day and night, to see that they perform their duty, and to select such guards as were acceptable to the lessees,”
2. Whether the State is liable to the lessees for damages sustained in consequence of the Governor pardoning a large number of convicts.
Upon their disagreement on these points the arbitrators selected J. E. Bailey to act as umpire in settling the questions of disagreement. The umpire was of opinion that the State was bound by the stipulations so -introduced into the contract by the Directors, *105 but .not for damages, if any, occasioned by the exercise of the pardoning .power by the Governor.
The arbitrators afterward disagreed on the following points:
1. Whether the failure to keep a night guard on watch in the shop where the fire originated, enabled the incendiary to consummate his design: and whether the lessees were, for that reason entitled to recover •of the State the value of the property thus destroyed.
2. As to the- value of the property destroyed.
3. As to the damages sustained by the failure to enforce strict discipline.
The umpire was of opinion that the failure of the Directors to keep a night guard on watch in the shop “did not cause the fire or the loss,” yet it “did enable the incendiary to consummate his design, and the destruction -was the direct and immediate consequence;” and therefore, the State was liable for the value of the property destroyed. As to the value of the property destroyed, the umpire was of opinion that the proof was not satisfactory, and that other evidence should be heard “at the option of the lessee;” otherwise the statement made to the insurance companies should be adopted as the only reliable estimate, which was $25,049.90. As to the damages sustained by the lessees for the failure to enforce strict discipline, the umpire estimated it at $30,282.96.
The lessees introduced- other evidence as to the value of the property destroyed by the fire, and the arbitrators again disagreed as to the following points:
*106 1. Whether the further evidence in regard to the value of the property destroyed was sufficient.
2. Whether the State should have the benefit of the amount received from insurance companies by the lessees.
The umpire was of opinion that the value of the property destroyed by the fire was $44,847.40. He was of opinion that the State was not entitled to a deduction for the amount received by the lessees from the insurance companies.
The award finally made, charges the State as follows:
Damages arising from want of discipline. $30,282 96
Damages on account of fire. 44,847 40
Certain small accounts. 1,303 21
Total.$76,433 57
And credited for hire of convicts... 61,333 29
Balance against the State.$15,100 28
It is proper to remark that one of the matters of dispute before the arbitrators was in regard to the use of a stone quarry belonging to the State, which the lessees claimed and used as part of the penitentiary property leased by them. This question, however, was withdrawn from the arbitration by the counsel for the State, and was not acted on by the arbitrators.
• After the award was made the lessees applied to the Comptroller for a warrant on the Treasury for the *107 amount awarded to them, but the comptroller declined to issue his warrant; thereupon the lessees filed their petition for a mandamus to compel the issuance of the warrant. The State and the Comptroller then filed their bill enjoining the further prosecution of .the mandamus, and praying that the appraisement and valuation of the tools, machinery, fixtures, unfinished work, etc., made in pursuance of the proposition of the lessees to surrender the lease, and the acceptance-thereof by the State, be set aside for fraud; also-praying that the award be set aside or rectified, because of mistake of law on its face, and for other reasons set forth in the bill.
The bill was filed on the 1st of October, 1869. On the 18th of December, 1869, the Legislature passed an act “that there shall be paid to Ward & Briggs, lessees of the penitentiary, the sum of $132,200.64,. for and on account of the assessment of the value-of their property, as made under the act of the 19th of February, 1869; Provided, that the lessees give immediate ' possession of the prison and property, but without prejudice to the suits now pending to either party.” It was further enacted that this payment of $132,200.64 shall, in no way, waive or impair the right of the State to contest the balance of the claim of Ward & Briggs for the balance of the assessment beyond the $132,200.64, etc. By the 4th Section of the act it was declared that the present bill, which was then pending, should be prosecuted to a final hearing, both as to the appraisement of the property and as to the award of the arbitrators.
*108 It is obvious that it was not the intention of the Legislature, by this act, to recognize the assessment of the property by the appraisers, and its valuation at |192,230. as binding upon the State. The amount ordered do be paid was 'fixed by deducting from this sum the amount found due the State by the lessees for hire of convicts, together with some other small accounts, and the manifest object in directing the payment was to get possession of the property and the workshops, which were withheld from the State by the lessees. But the question as to the fairness or unfairness of the assessment and valuation of the property of the lessees was expressly left for adjudication in -the suit then pending.
The lessees admit in their answer that they accepted the payment of the $132,200.64, and they state that they surrendered the property as provided for in the act. But they deny the allegations of the bill which impeach the fairness of the appraisement and valuation of the property, and insist that the property was fairly valued, and that they were guilty of no fraud. The evidence in the cause fails to overturn the denials in the answer; on the contrary, the weight of the proof in the record sustains the answer. It -is, therefore, not necessary for us to allude further to this feature in the bill.
We proceed, therefore, to examine the other phase of the bill, in which it ' is sought to set aside or rectify the award of the arbitrators, on the ground that there is apparent on its face a mistake of law.
The first position taken for defendants goes to the *109 jurisdiction of the Chancery Court to entertain the bill on account of error or mistake of law. It is insisted that the award is final and conclusive, and not subject to be re-éxamined. The first ground on which this objection rests is, that this is not an arbitration and award inter partes, in the ordinary sense, but it is in the nature of a government commission or special tribunal established by the government, whose decision is conclusive and not re-examinable in a court of law or equity — that it has the force and effect of a judgment of a tribunal having exclusive jurisdiction of the matters adjudicated.
Whether the board which made the award was an arbitration in the ordinary acceptation of the term, or a commission appointed by the Legislature, must be determined by the language of the resolution which originated it. After directing the Attorney General to postpone further action in the suit brought against the lessees, the resolution proceeds — “ and that an arbitration proposed to be established, by the appointment of an arbiter by the Governor; one arbiter to be appointed by said lessees, both of whom shall be learned in the law, and the two so appointed shall select an umpire' to settle any question of disagreement, and the board thus formed, shall examine and determine all questions between the parties, and their decision shall be accepted as a final settlement of the matters in dispute between the State and the lessees of the Penitentiary ; and to make their proposition binding on the parties, said Ward & Briggs; shall file with the Secretary of State, etc., a written acceptance of the *110 terms proposed, etc.; otherwise, tbe Attorney General shall prosecute said suit.” It is observed that the lessees have the election to accept this proposition or to defend the suit already commenced. The board proposed was not to be established, except upon the consent of the lessees, and they were to have an equal voice with the State in selecting the board of arbitrators. The decision of the arbitrators was to be accepted as a final settlement of the matters in dispute. The proposition was for -an arbitration — the parties each to select one arbiter learned in the law— and these arbiters to select an umpire. There is nothing uncertain or ambiguous in the language of the resolution. It can not mean anything more or less than an ordinary arbitration. It is not the designation of an officer of the State to examine and decide the matters in dispute — it is’ not the creation of a board or commission by the State, through the Legislature, to determine the' questions — it is not a special court with power to adjudicate the matters in dispute —but it is simply a proposition by the State, to divest itself of its soverignty, pro hae vice, to meet two of its citizens on equal terms, in establishing a board of arbitration. When the proposition was accepted, it became an ordinary arbitration — nothing more— nothing less. It follows that the authorities referred to in argument, as to the finality or conclusiveness of governmental commissions, of whatever kind, have no applicability to the action of the arbitrators. The award made by the arbitrators may therefore be im *111 peached or set aside for any cause which would vitiate one made between individuals.
But it is argued that the decision of the arbitrators is necessarily final when the State is one of the parties. This position rests upon the assumption that the State is a party to the arbitration in her capacity as a sovereign — and in such case the remedies could not be mutual, as the lessees could not sue the State, if they were dissatisfied with the award for any cause which would vitiate it. Hence it is argued, that the State intended the award to be final, otherwise such an arbitration would be a fraud. If it be conceded, that the State was a party to the arbitration as a State, it would not follow that the lessees would have been without remedy, if they had been dissatisfied with it and regarded it as voidable for mistake of law, or for other matter apparent on its face. In that case the award would not have been binding on them and they would have been entitled to a warrant for the full amount of the appraisement of their property. If the Comptroller refused to issue the warrant, the lessees could resort to the remedy by mandamus, when the State would be compelled to put the validity of the award in issue,
But it is a mistake to assume that the State was a party to the arbitration, in her sovereign capacity. By voluntarily proposing to submit the matters in dispute to arbitration, the State necessarily agreed to waive its exemption from suit, so far as to give to the lessees all the benefits of the award, or to protect them from the consequences of an illegal award. If *112 then the lessees had desired to attack the award directly for any cause rendering it void, the State, by its agreement to- arbitrate, had estopped itself from denying the right of the lessees to sue. The agreement to submit to an arbitration necessarily implies that the award made is to be legal, and if it is not, that either party shall have the right to show its illegality by regular judicial proceedings.
It is next said that it is apparent on the face of the resolution proposing the arbitration, that the award was intended by the Legislature to be final. This intention is inferred from the fact that the arbitrators were to be “learned in the law,” and from the further fact, that by Sec. 5, Ch. 50 of the Act of 1868-9, payment of the amount that might be awarded to the lessees is provided for. It is obvious from these facts, as well as from the express language of the resolution, that it was intended by the parties that the award should be final. But the same is true of every submission of disputed matters to arbitration. It- is presumed that arbitrators will act legally and make their awards free from legal objections. But such submissions are made subject to the rules of law applicable to awards procured by improper means, or in which there are errors or mistakes of law or fact apparent on their face which vitiate them. There is nothing in the language of the resolution submitting this case to arbitration which distinguishes it from ordinary arbitrations.
It is next maintained for defendants, that the award is final and cannot be re-examined, because the arbi *113 tration was made under a contract by which the lessees surrendered the- unexpired term of their lease,, which they would not have done, if they had not understood that the award was to be final. And that as they cannot now be placed in statu quo, it would be inequitable in the State not to execute the award. To this position it is answered by the counsel for the State, that the proposition by the lessees to surrender the lease and its acceptance, was entirely separate and distinct from the proposition of the State to submit “all questions between the parties” to arbitration, and its acceptance. This presents an issue as to the facts. We find that the proposition of the lessees to surrender the lease was made on the 8th of January, 1869— they propose the surrender upon an appraisement of their property, and the payment of the appraisement. At the date of this proposition the resolution .proposing an arbitration had not been passed — it was not passed until the 15th of February, 1869, and makes-no reference to the proposition of the lessees to surrender their lease. And on the 19th of February,. 1869, the Legislature passed an Act, by the first section of which the proposition of the lessees to surrender the lease was accepted, and by the second section the Comptroller was directed to issue his warrant upon the Treasurer to the lessees for the appraised valne of the property, and by the third section the lease-was declared to be cancelled and both parties released therefrom, upon the conditions aforesaid being complied with. It is manifest that the propositions to surrender the lease and to submit the matters in dispute to- *114 arbitration, had no connection with each other. At the time the proposition to arbitrate was made, no question was in dispute between the parties, except as to the damages claimed by the- lessees on account of bad discipline and on account of the fire — and the claim of the State for the hire of the convicts. When the proposition of the lessees to surrender the lease was accepted, there was no dispute as to the appraisement and none could have been anticipated. To get possession of the Penitentiary property the Legislature agreed to buy out the lessees and to pay the appraised value of their property. This was one distinct, independent transaction. To have a speedy settlement of the matters then in dispute, the Legislature proposed an .arbitration of those matters, which was accepted by the lessees. This was another distinct and independent transaction. It follows as a matter of fact that the surrendering of their lease was no consideration for which the lessees agreed to accept the proposition to arbitrate; and, hence, that the agreement to arbitrate was purely voluntary on both sides.
It is insisted for the State that the award is void, because not “mutual, complete and final.” It is said that one of the matters before the arbitrators was, the liability of the lessees for the use of the stone quarry; and as they failed to include this matter in their award, the same is therefore incomplete and void. It is observed that the reference to the arbitrators was in general terms, to “ examine and determine all questions between the parties.” There was no enumeration of the matters in dispute in the. resolution of submis *115 sion. These matters were left to be brought before the arbitrators by the parties. It appears that the parties were represented before the board of arbitrators, and that the counsel for the State brought forward the claim for the use of the stone quarry, and that much proof was taken in regard to this claim. But before the award was made, the claim for the use of the quarry was withdrawn by the counsel for the State, and for that reason the arbitrators did not pass upon this question. We are of opinion that the counsel for the State had the right to withdraw the claim from the arbitrators, especially as it was not enumerated as oné of the matters in dispute, and the arbitrators could only act upon such matters as the parties or their counsel might bring before them. The failure of the arbitrators to pass upon this claim did not, therefore, render the award incomplete and void. The same remark is applicable to some other matters alluded to in argument, as not having been passed upon by the arbitrators. It is sufficient to say of them that the counsel for the State, in his discretion, did not think proper to require the action of the arbitrators upon them.
The next position taken by the counsel for the State is, that the award impeached is not binding, for error of law or mistake of law apparent on its face. To determine the question thus raised we do not deem it necessary to look for authorities outside of our own State. The question has been frequently raised and may be regarded as definitely settled. In Nance v. Thompson, 1 Sneed, 325, Judge McKinney said: *116 ‘‘Where a question of law and fact is referred, it is. held that where it appears from the face of the award, that the arbitrators intended to decide according to. law but were mistaken as to the law, this is a sufficient reason for setting the award aside, at least so far as it is affected by the mistake. But if the aiv bitrators, disregarding what they know to be the law of the case, or leaving it entirely out of their consideration, make what in their judgment, under all the-circumstances of the case, is deemed to be a proper or equitable decision of the matter, it is no valid objection to the award, that it is manifestly against law, provided they’ be not required by the terms of the submission to follow the law in making their award. It must clearly appear, not only that the arbitrators are mistaken in point of law, but likewise that they intended to follow the law, and would not have made such an award if they had known what the law was.”
In the case of Fain v. Headerick, 4 Col., 338, Judge Milligan said, that “arbitrators under a general submission, are presumed to be the judges of the law, and the facts necessary to their decision; and a mistake in the law, if the award is founded upon principles of equity and good conscience, will not generally be sufficient to set it aside. But if they assume to decide strictly according to law, and mistake it, although the mistake is made out, says Judge Story, by extraneous evidence, that will be sufficient to set it aside:" 2 Sto. Eq., § 1454-5.
In Sec. 1456a Judge Story says, “the mistake in *117 matter of law, to render the award voidable in equity, must appear by the question being stated on the face of the award, as a justification of the conclusion to which the arbitrators came; or else it must be shown that the arbitrators, intending to follow the law, have misapprehended it, and were thus brought to a different result from what they would otherwise have reached.”
In the application of these principles to the present case, the question arises, Was the submission to the arbitrators general, and have they made their decision upon principles of equity, without regard to the law of the ease — or was the submission intended to have the award of the arbitrators according to law, and have they made their award, intending to follow the law, but having misapprehended it, have thus reached -a different result from what they otherwise would have reached ? The resolution is in general terms, submitting “all questions between the parties” to two arbitrators “learned in the law.” What were the questions between the parties? They were questions of law as well as of fact — but mainly questions of law. "The fact then that arbitrators “learned in the law” Avere selected to “examine and determine all questions between the parties,” raises a strong presumption, that the parties understood that the award or “decision” of the arbitrators should be made in pursuance of law. it is clear that the arbitrators understood that they were to examine and determine the questions according to law, and it is equally clear that, in making their award, “they were intending to follow the law,” and *118 if they have not done so, it was beeause they misapprehended what was the law in regard to the questions submitted to them for examination and determination. If then, in the language of Judge McKinney, “it clearly appear, not only that the arbitrators are mistaken in point of law, but likewise that they intended to follow the law, and would not have-made such an award if they had known what the law was,” it follows that the award is subject to be impeached for mistake or error of law.
This brings us to the question, whether there is. clear error or mistake of law on the face of the award, and whether it also clearly appears that the arbitrators intended their award to follow the law ? The award states, that the two “arbitrators differed in. opinion upon two points, as shown by their written, opinions herewith returned, to-wit:
First. As to whether the law authorizing the lease of the labor of the convicts in the State prison conferred upon the Directors the power to include in the-lease the stipulations therein inserted, in regard to keeping the convicts under strict discipline, and in regard to furnishing a guard for each shop, day and night, and seeing they faithfully performed their duty, and furnishing such guards as should be acceptable to-the lessees, and thereby to bind the State for the' performance of these things; and,
Second. Whether the pardon by the Governor of' some three hundred and fifty-three convicts in the winter- and spring of 1868, was a violation of the contract of lease?”
*119 Upon these differences of opinion between the arbitrators they selected “an umpire, who, as shown by his written opinion herewith returned, decided that the law conferred upon the Directors the. power to insert these stipulations in the lease, and' thereby to bind the State. And that the pardoning of the three hundred' and fifty-three convicts was not a violation of the contract of lease.”
After this decision by the umpire, the arbitrators-again differed, which matters of difference were referred to the umpire, who decided:
“First. That as the evidence showed the-fire could easily have been extinguished if a night guard had been on duty in the cooper’s shop, at the time the fire was first discovered, the failure of the Directors to-keep a night guard on watch in this shop enabled the incendiary to consummate his design, and the destruction of the property of the lessees was the direct and immediate consequence. The lessees have the right to recover of the .State the value of the property thus-destroyed.”
The umpire decided further that the lessees were-entitled to recover of the State $30,282.96 as damages for the failure of the Directors to enforce strict discipline among the convicts. He also decided that the lessees were entitled to recover of the State $44,847.40' as damages by the fire.
Upon the face of the award, as well as- the opinions of the arbitrators and the umpire, referred to in the award, that they all construed the submission as requiring them to ascertain and follow the law in com *120 ing to their conclusions — and that they did not undertake to base their award upon general views of equity, regardless of the questions of law involved. It is equally certain that they made their award as they did because they believed they were following the law, and that their award would have been different, if they had believed the law to be different.
It appears from the award, that the arbitrators and umpire were of opinion, that the law did not entitle the lessees to the claim for damages, growing out of the pardon by the Governor of three hundred and fifty of the convicts, within a period of a few weeks. Although the lessees were willing to acquiesce in the award, yet as the State has sought to set it aside, they are not precluded from insisting on the claim in this suit.
This claim raises the question whether the State can be made responsible for damages arising from the excessive exercise of the pardoning power by the Governor. The lessees are presumed to have entered into the contract of hire of the convicts, with a knowledge of and in reference to, the constitutional power of the Governor to grant pardons. It may be true, that in making the contract, they could not reasonably anticipate the extraordinary exercise of the pardoning power, which, within a few weeks, deprived them of three-fowrths of the convicts whose labor they had hired. It may be true, that this unusual reduction of the number of their hirelings may have resulted in heavy loss and damage to them. But it must be borne in mind, that they entered into the contract in reference to the *121 prevailing law, that the government does not guaranty to any person the fidelity of any of its officers or agents, whom it employs. The lessees therefore voluntarily took upon themselves the risk as to the Governor’s ordinary or extraordinary exercise of the pardoning power.
The rule of law governing the case is thus laid down by Judge Story:
“It is plain, that the government itself is not responsible for the misfeasances, or wrongs, or negligen-cies, or omissions of duty of the subordinate officers -or agents employed in the public service; for it does not undertake to guaranty to any person the fidelity of any of the officers or agents, whom it employs; since that would involve it, in all its operations, in endless embarrassments, and difficulties, and losses, which would be subversive of the public interests; and, indeed, laehes are never imputable to the government:” Story Agency, sec. 319; 8 Wend., 403—422; 9 Wheat., 720.
It is clear, therefore, that the decision of the arbitrators as to the claim against the State for damages on account of the abuse of the pardoning power by the Governor was correct, and that they legally set up no such claim.
It is insisted for the State, that the decision of the arbitrators, that the Directors had the power to insert in the contract of lease, the clauses in regard to keeping the convicts under strict discipline, and in regard to furnishing a guard for each shop, day and night, and thereby to bind the State, was a clear error or *122 mistake of law. For the lessees it is insisted, that the Directors had the right by the law to insert the additional stipulations and that the. State is bound thereby.
By the act of 1866, oh. 34, provision was made for leasing out the convict labor of the Penitentiary. The same act appointed certain persons as Directors of the prison, to take' control, with all its property and effects, and directed them to proceed to advertise for sealed proposals to employ by hire the labor of all the convicts in said prison, which advertisement was to set forth in full the conditions upon which said labor was to be hired. The sealed proposals were to be .opened in presence of the Governor, and the contract awarded . to the highest and best bidder’,, all circumstances being fully considered — after which the Directors were to close the contract, which was to. embrace substantially the following conditions: “ The lessee shall be authorized to occupy and take charge of all the shops and work-houses in said prison; to. put up such machinery, as he may desire; and shall have the privilege of buying, at such prices as may be agreed on, all the tools, fixtures, and materials on hand,, both finished and unfinished. Said lessee shall also be bound to hire all the able convicts on hand, or that may hereafter come into said prison during the term of lease, excepting such as may be necessary to keep up the establishment. Said lessee shall treat those hired with humanity and kindness, conforming; to such rules, by-laws, and regulations as may be established by the Directors, and work them not exceed *123 ing ten hours each day. For each convict so employed, the lessee shall pay into the State Treasury the .price per day bid, said payment to be made quarterly,” etc.
The advertisement having been made as directed,, those under whom the present lessees claim, put in a. bid, which was accepted by the Directors. The legal effect of this acceptance of the bid was to consummate, the contract — nothing then remained but to reduce it. to writing and. to have the necessary bonds executed. It was made the duty .of the Directors to close the-contract by embracing in the lease substantially the foregoing conditions.
It is proper here to remark that the lessees put in their proposals, in view of the conditions specified in the law and in the advertisement, and in view of the fact that by the law the prison was to continue under the general superintendence and control of the Directors, who were authorized to make rules, by-laws,, and regulations, to which the lessees were to conform. It was therefore manifest that when the lessees put in their bid and when the same was accepted, the lessees agreed to take the risk as to the fidelity of the Directors in making the necessary rules, by-laws and regulations for governing the prison and maintaining discipline. They were bound to know that the State-did not undertake to guaranty the fidelity of the Directors in the discharge of their official duties. The-legal import of their bid and its acceptance was, that as to the terms and conditions specified in the law and the advertisement the State was to be bound— *124 but as to the performance of the duties of the Directors as officers and agents of the State, the State assumed no obligations to the lessees.
Such was the legal status of the contract after the bid was accepted and before the same was closed by the written lease. When the lease was executed, the Directors followed the directions of the law in embracing substantially the conditions and stipulations prescribed — but they went further and added other conditions and stipulations, as follows:
The convicts are “to be kept under strict discipline” — “The Directors or wardens are to furnish a guard for each work-shop, day and night, and see that they faithfully perform their duty, and select such guards as are acceptable to the lessees. * * The lessees, with the consent of the Directors, may impose tasks upon the convicts, and pay the Directors, for the benefit of the convicts, such price as may be agreed on, for over-work, if any.”
The question arises, had the Directors any legal right or power, express or implied, to introduce these additional clauses into the contract of lease? It is not, whether, in the discretionary discharge of their duties as Directors, they might not have made rules, by-laws and regulations for their own government and the government of the prison, embracing these several -clauses: — but rules, by-laws and regulations so made, their violation by the Directors would have created no liability on the State for damages resulting to the lessees: — upon the plain principle already stated, that -the. State does not guaranty the fidelity of its officers *125 and agents. But the question is, could the Directors, legally introduce these clauses into the contract, and thereby bind the State to answer for any damages that might result from their misfeasance, malfeasance, negligence or omission of duty? Most clearly there is no. such express power conferred by the clauses which they were specifically directed to embrace in the contract. The powers of the Directors in closing the contract are defined with distinctness and precision. They were instructed specially what stipulations and conditions were to be embraced. So far as these stipulations and conditions were embraced, the Directors were acting within the scope of their authority, and the State was bound thereby; but as to those stipulations and conditions not specified by the law, the Directors had no authority to embrace them as parts of the contract made by the State. There is no exception to the rule that a public agent has no authority except what is actually conferred. Without referring to the numerous authorities in which the rule as to public agents or officers is laid down, it will be sufficient to quote one or two. Judge Story, in his work on Agency, sec. 307a, says:
“In respect to the acts and declarations and representations of public agents, it would seem, that the same rule does not prevail, 'which ordinarily governs in relation to mere private agents. As to the latter (as we have seen,) the principals are in many cases bound, where they have not authorized the declarations and representations to be made. But in cases of public agents, the government, or other public authority, *126 is not bound, unless it manifestly appears that the agent is acting within the scope of his authority, or he is held out as having authority to do the act, or is employed, in his capacity as a public agent, to make the declaration or representation for the government.”
In the Floyd acceptances, 7 Wall, 680, Justice Miller said: “Our statute books are full of acts authorizing the making of contracts with the government through its various officers and departments; but in every instance, the person entering into such a contract must look to the statute under which it is made, and see for himself that his contract comes within the terms of the law.”
It follows that as no authority is found in the third section of the act of 1866, ch. 34, for the introduction into the lease, by the Directors, .of the additional clauses, they exceeded their authority, and the Saihe are not binding on the State, unless the authority can be found in some other portion of the act. It has been argued that the power to insert the additional clauses may be derived from Secs. 11 and 16 of the act of 1866, ch. 34. The former of these sections authorises the Directors to “determine the number and character of the guards for said prison, and shall appoint the same.” The latter authoi'ises the Directors to “establish such rules, regulations, and bylaws for the government of the entire prison as they may think best to promote the health, comfort, order, and discipline of the convicts, and the proper deportment of the lessees, keepers, and guards of the prison.” These sections of the law vest in the Direct *127 •ors a large discretion as to making rules and regulations for tbe government of the prison, and as to determining the number and. character of the guards for the prison. It was the object of the Legislature to retain the government of the prison under the superintendence and control of officers of the State, who would promote the health, comfort, order, and discipline of the convicts. Whether the Directors c dd, under these powers, have legally adopted the additional clauses in the lease as their rules and regulations for promoting the health, comfort, order, and discipline of the convicts, it is not necessary to determine. If they could, it would not follow that they had a right to enlarge the liability of the State by inserting these additional clauses into the contract of lease so as to make the State guaranty their own fidelity. The error of the argument is in assuming that any thing which it is made the duty of the Directors to do, or any thing which they were empowered to do, they might, by contract with the lessees, bind the State to do. The only contract which the Directors had the authority to close was that which the State, through the Governor and Directors, had agreed on when they accepted the bid of the lessees. They were not empowered to make a contract, but to consummate one already, agreed on, and their authority was limited by the instructions which specified the stipulations and conditions of the contract already agreed on.
In Clark v. the State, 7 Col. 317, the court said; “If an officer or agent of the State, in violation of law, commits an act to the injury of the citizen, it *128 is an act beyond the scope of his agency, unauthorized by his principal, and the State is not liable therefor to the party injured.” The 11th and 15th sections of the act of 1866, ch. 34, empowered the Directors to determine the number and character of the guards, and to make rules and regulations for the-government of the prison; for any abuse of their power, or for any omission or negligence in exercising it, the State would not be responsible; If responsibility rested anywhere, it would be on the Directors individually. But when they seek to shift this responsibility upon the State by making the State a party to a contract embracing stipulations which they were authorized to make, they are acting outside of the scope of their authority, and the State is not bound thereby; nor can the insertion of the additional Clauses in the contract be justified upon the ground that they were necessary in order to carry out the power which was conferred on the Directors. We have already seen that the additional clauses were inserted in the written lease by the Directors after the terms of the contract had been fixed by the bid of the lessees and its acceptance by the Directors, in presence of the Governor. It was, therefore, not necessary to the execution of the contract, that the additional clauses should be inserted.
Our conclusion is that the award contains on its face a clear error of law in deciding that the Directors had the authority to introduce into the contract of lease the additional’ conditions, and that the State was thereby bound.
*129 But it is insisted for the lessees, that although the contract of lease may have had inserted into it stipulations and conditions not authorized by law, yet that the State is bound, because these illegal stipulations and conditions were ratified' by the Legislature. The Directors of the Penitentiary were constituted the agents of the State by an act of the Legislature, with power to close a contract of lease upon specific terms and conditions. They execute the power as authorized, but then assume to add other stipulations and conditions outside of the power conferred, and not within the scope of their authority. The question now is, what kind and amount of evidence are necessary to constitute a ratification or adoption of the illegal stipulations and conditions injected into the contract? It is clear that the ratification or adoption,, to be effective, must be made by the principal from whom the agent assumed to have authority. In this, case the Legislature, by legislative enactment, appointed the Directors the agents. To make their illegal acts, valid by ratification or adoption, the act of ratification or adoption must be legislative in its character. It is not enough that the individual members of the-Legislature should have knowledge of the existence of the illegal stipulations in the contract, and should .acquiesce passively therein. But to amount to a ratification or adoption, they must take some definite action as an organized Legislature, either expressly recognizing and adopting the illegal stipulations, or some definite action as a Legislature, from which an intention to ratify them may be fairly implied. In 18 *130 Maryland, 282, it was held that “a municipal corporation cannot be held liable for the unauthorized acts of its agents, although done officii colore, without some corporate act of ratification or adoption.”
In 20 Maryland, 14, after speaking of cities, and other municipal corporations, as auxiliaries of the government, the court say: “Acts of ratification by such bodies politic should be direct, explicit, unequivocal, with full knowledge of the facts.”
The same rule is recognized in 16 Calif., 623, in which it is said: “To ratify is to give validity to the act of another. A ratification is equivalent to a previous authority: it operates upon the act ratified in the same manner as though the authority had been originally given. It follows, as a consequence, that where the authority can originally be conferred only in a particular form or mode, the ratification must follow the same form or mode; where an authority to do any particular act on the part of a corporation can only be conferred by ordinance, a ratification of such act can only be by ordinance.”
The reasons on which the rule as to ratification or adoption by a municipal corporation, which is a quasi legislature, apply with full force to the case of ratification by a State through its Legislature. The act of ratification or adoption must be legislative in its character, and it must be so explicit and definite as to show that the illegal stipulation was intended to be recognized and adopted.
Adopting this as a sound rule, we have been unable to find any thing in the various legislative docu *131 ments to wbicb we have been referred which indicates any such legislative action as amounts to a ratification or adoption of the unauthorized portions of the contract of lease. On the contrary, soon after the first direct information was communicated to the Legislature, as to the claims for damages, set up by the lessees, under the unauthorized clauses, we find a movement in the Legislature proposing to declare the contract null and void, and soon thereafter a proposition by the lessees to surrender their lease. We are, therefore, of opinion that there has been no ratification by the Legislature of the contract of lease as made by the Directors.
The conclusion at which we have already arrived as to the first mistake or error of law, must dispose of the case so far as setting aside the award is concerned; and hence there is no real necessity for us to determine the question raised as to the mistake or error in regard to the rule of damages adopted in the award. But as the question is presented in the record, we will dispose of it without going elaborately into the authorities.
The arbitrators award to the lessees $44,000, the value of their property destroyed by the fire, as damages for the breach of the contract by the Directors in failing to have a guard, night and day, for each workshop. It is assumed by the arbitrators that the fire was the work of an incendiary, and that the proof shows that if there had been a guard in the shop where the fire originated, he might have extinguished it, and thus prevented the loss; that the fail *132 ure of the Directors to have a night guard enabled the incendiary to consummate his design, and therefore that the fire and the loss were the direct and immediate consequences of the breach of the contract.
On the question of law as to the damages, there was a difference of opinion between the arbitrators, and the disagreement made it necessary to call in the umpire. He held that the failure to keep a night watch in the shop “did not cause the fire or the loss,” yet he says it “did enable the incendian y to consummate his design, and the destruction was the direct and immediate consequence.”
We consider the law on this subject to be well settled in this State, by a series of decisions, commencing with Hendricks v. Stewart, 1 Tenn., 476, and followed ever since. In that case the court say: “In actions founded on torts, or quasi torts, juries must necessarily have considerable discretion and latitude, there being no certain means by which the court can say what ought to be the damages. In simple breaches of contract the rule seems to be different, and there the nature of things admits the establishment of certainty and precision, which is at all times desirable. The plaintiff is not entitled to damages for any fancied or probable advantage he might have derived from his contract. The defendant contracts to repair the boat; the plaintiff is entitled to damages to the amount of these repairs, and no more.”
In Pettee v. Tenn. Manufacturing Co., 1 Sneed 387, the court say: “Damages for breaches of contract are only those which are incidental to and directly *133 -caused by the breach, and may be reasonably supposed to have entered into the contemplation of the parties, and not speculative profits, or accidental or consequential damages.”
In McWhirter v. Douglas, 1 Col., 602, the question arose as to how damages on a breach of contract were to be estimated, when Judge Wright adopted the rule as laid down in Hendricks v. Stewart, 1 Tenn., and held that the contract itself must give the measure of damages, and if it fails to do so the damages can only be nominal.
Adopting the rule for ascertaining damages for breaches of contracts settled by the_ several authorities referred to, we haye but to look to the contract in the present case to determine the question. The Directors assumed to bind the State to furnish a guard for each shop, day and night. By other terms of the contract the lessees were expressly “ authorized to occupy and take charge of all- the shops and workhouses in said prison.” Having the occupancy and -charge of the shops, the lessees desired to avoid the' expense of a night guard for each shop. To avoid this expense, and throw it on the State, the Directors agreed to furnish a guard for each shop, day and night. Looking to the contract, then, for the measure of damages for its breach, it follows inevitably that the expense of such guards as are contracted, furnishes the true measure of damages.: It is conceded for the lessees that the failure to keep a night -guard on watch did not cause the fire, but it enabled the incendiary to consummate his design of setting fire *134 to the shop. "While, therefore, it is clear that the loss was the direct and immediate consequence of the fire, it is equally clear that it was not the direct and immediate consequence of the failure to keep up a night watch. Such a loss cannot reasonably be assumed to have entered into the contemplation of the parties. The contract was that a night guard should be employed; the breach was in not having such guard; the damage looked to in making the contract was the expense of such guard, and not the probable or possible or remote damage that might occur.
We are, therefore, of opinion that there is a clear mistake of law on the face of the award as to the mode of estimating the damages for the breach of the stipulations as to keeping a night guard, and as. to enforcing strict discipline among the convicts.
But it has been argued that even if there is clear mistake or error of law on the face of the award, that a court of chancery has no jurisdiction to set aside or rectify the award, in the case of an award made inter 'partes, and not in pursuance of an order of court. It is conceded that when a case is referred, by an order of court, to arbitrators, and the-award is sought to be made the judgment of the court, it is competent for the court to set it aside and refuse to. enter it, if there is clear error or mistake of law on its face, in those cases in which it appears that the arbitrators intended to decide according to law, but mistook it.
Upon sound reason a court of equity ought to have-jurisdiction to interpose in oases of arbitrations inter- *135 partes, in which there are clear errors or mistakes of law, but which, not being returnable to any court for its sanction, can not be otherwise corrected or set aside than by a court of equity. This jurisdiction has been too long exercised in England, in other-States, and in our own, to be now questioned. But. if there ever could be any doubt as to the jurisdiction of the Chancery Court in this case, that doubt was removed by the acceptance by the lessees of the-$132,200.64, under the act of December 18, 1869.. By the 4th section of that act it was expressly enacted that the present bill was to be prosecuted to final hearing as to all the matters stated in the bilk The acceptance of the money under this act by the lessees was a waiver in law of all objections to the-jurisdiction of the court, and an agreement that the-suit was to be prosecuted on its merits.
In the bill is an allegation that the lessees took possession of the stone quarry and used the stone,, and so abused the quarry as to do great damage to-the State. There is a special prayer that the lessees-be held to account for the value of the stone used, and the damage done to the quarry.
The lessees insist that the stone quarry was an appurtenance to the penitentiary, and that the use of it passed to them under the lease. They prove by one or two of the Directors that they considered the quarry as part- and parcel of the penitentiary property, and that the lessees used it with the consent of the Directors, under the belief that they were entitled- to it under the lease.
*136 By the terms of the contract, the “lessees are to •occupy and take charge of all the shops and workhouses on the grounds belonging to said prison, and may put up such machinery as they may desire, and .shall have the privilege of buying, at such prices as may be agreed on, all the tools, fixtures, and materials on hand.” The stone quarry is the property of the State, just as the prison property and grounds are, but they are separate and distinct, having no necessary connection with each other. It is clear that the quarry is not embraced by the language of the lease, nor are we able to see that it could, by any reasonable construction, be held to be embraced by it. We are, therefore, of opinion that the State is entitled to an account for the value of the stone taken from the quarry, and for any unnecessary damage thereto, as ordered by the Chancellor.
Upon the whole case we affirm the decree of. the Chancellor, and remand the 'cause that the account as to the stone quarry may be taken as directed by the decree below. The costs of this court will be paid by the appellants, and of the court below as the Chancellor may order.